**JUDICIAL WATCH, INC., Plaintiff,**

v.

**NATIONAL ENERGY POLICY DEVELOPMENT GROUP, Defendant.**

**Sierra Club, Plaintiff,**

v.

**Vice President Richard Cheney, et al., Defendants,**

Nos. Civ.A. 01–1530(EGS), Civ.A. 02–631(EGS).

United States District Court, District of Columbia.

July 11, 2002.

Larry Klayman, Judicial Watch, Inc., Washington, DC, for plaintiff Judicial Watch.

Patrick Gallagher, Alex Levinson, San Francisco, CA, for plaintiff Sierra Club.

Anne L. Weismann, Thomas Millet, Jennifer Paisner, U.S. Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, for federal defendants.

Howard M. Crystal, Meyer & Glitzenstein, Washington, DC, for amicus NRDC.

Robert S. Litt, Arnold & Porter, Washington, DC, for defendant Thomas Kuhn.

Paul Christian Rauser, Williams & Connolly, Washington, DC, for defendant Haley Barbour.

Richard D. Horn, Bracewell & Patterson, LLP, Washington, DC, for defendant Mark Racicot.

## MEMORANDUM OPINION

SULLIVAN, District Judge.

Plaintiffs Judicial Watch, Inc. and Sierra Club filed these now-consolidated lawsuits against Vice President Richard Cheney, the National Energy Policy Development Group ("NEPDG"), various other federal officials,[1] and private individuals[2] to enforce the requirements of the Federal Advisory Committee Act ("FACA"), 5

1. The federal officials named in Judicial Watch's Second Amended Complaint include: Secretary of the Treasury Paul O'Neill, Secretary of the Interior Gail Norton, Secretary of Agriculture Ann Veneman, Secretary of Commerce Donald Evans, Secretary of Transportation Norman Mineta, Secretary of Energy Spencer Abraham, Secretary of State Colin Powell, Director of Federal Emergency Management Joseph Allbaugh, Administrator of the Environmental Protection Agency Christine Todd Whitman, Chairman of the Federal Energy Regulatory Commission Patrick Wood, Director of the Office of Management and Budget Mitchell Daniels, Assistant to the President Joshua Bolton, and Assistant to the President Larry Lindsey. The federal officials named in Sierra Club's Complaint include: Andrew Lundquist, Executive Director of the NEPDG, Director of Energy Policy for Vice President Cheney and Senior Policy Advisor to the Department of Energy, Secretary Abraham, Secretary Evans, Secretary Norton, Secretary Veneman, Secretary O'Neill, Secretary Mineta, and Administrator Whitman.

2. The private individuals named in Judicial Watch's Second Amended Complaint include: Mark Racicot, Haley Barbour, Kenneth Lay, Thomas Kuhn, and John and Jane Does 1–99, Certain Unknown Non–Federal Employees. Sierra Club sued no non-federal individual defendants.

U.S.C.App. 2, the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq*, and the federal mandamus statute, 28 U.S.C. 1361. While the claims raised by each plaintiff differ in relevant and important ways, there is substantial overlap between the two complaints. Both plaintiffs seek information concerning the activities of the NEPDG and its members in developing and recommending to President George W. Bush a national energy policy. Both plaintiffs allege that private individuals were given a significant role in developing this energy policy, and as a result, the confidentiality under which the NEPDG operated violated the requirements of FACA. Defendants have moved to dismiss both complaints, raising a number of jurisdictional, statutory, and constitutional objections to these suits.

This case comes before the Court on federal defendants' motions to dismiss the Judicial Watch and Sierra Club complaints, as well as three private defendants' motions to dismiss the Judicial Watch complaint. Upon consideration of these motions, the responses and replies thereto, the oral argument of counsel, the applicable statutory and case law, the Court grants in part and denies in part the federal defendants' motions, and grants the private defendants' motions.

## BACKGROUND

### I. The National Energy Policy Development Group

On January 29, 2001, President George W. Bush issued a Memorandum establishing the National Energy Policy Development Group. *See* Sierra Club Compl. at ¶ 16; Defs.' Mem. of Points & Authorities in Support of Defs.' Mot. to Dismiss filed on 3/8/2002, Attach. A ("Bush Mem."). The Presidential Memorandum mandated that the NEPDG was to be established within the Executive Office of the President and was tasked with developing a national energy plan. *Id.* The mission of the NEPDG was to "develop a national energy policy designed to help the private sector, and as necessary and appropriate Federal, State, and local governments, promote dependable, affordable, and environmentally sound production and distribution of energy." *Id.* The expressly delineated functions of the NEPDG were to gather information, deliberate, and make policy recommendations to the President. *Id.* The President assigned the NEDPG the task of submitting reports to the President on the difficulties in ensuring the country's energy needs and setting forth a recommended national energy policy consistent with the group's mission. *Id.* The NEPDG was given a limited duration and was authorized to act only through the end of the 2001 fiscal year. *Id.*

Vice President Cheney was tasked with directing the group, presiding at meetings, and establishing any subordinate groups to assist the NEPDG in its work. *Id.* The memorandum appointed the following individuals as members of the group: Vice President Cheney, the Secretary of the Treasury, the Secretary of the Interior, the Secretary of Agriculture, the Secretary of Commerce, the Secretary of Transportation, the Secretary of Energy, the Director of the Federal Emergency Management Agency, the Administrator of the Environmental Protection Agency, the Assistant to the President and Deputy Chief of Staff for Policy, the Assistant to the President for Economic Policy, and the Assistant to the President for Intergovernmental Affairs. *Id.* The memorandum also stated that the Vice President could also invite, when appropriate, the Chairman of the Federal Energy Regulatory Commission to participate, as well as the Secretary of State, and "other officers of the Federal Government." *Id.* Funding and support

staff were to be provided by the Department of Energy ("DOE"), and if necessary, by the National Economic Council and other appropriations available to the President.

On May 16, 2001 the NEPDG issued a public report that recommended a set of policies in the form of administrative actions and proposed legislation. *See* "Reliable, Affordable, and Environmentally Sound Energy for America's Future," Report of the National Energy Policy Development Group, available at www.whitehouse.gov/energy/National–Energy–Policy.pdf. That report was approved by the President as the National Energy Policy. *Id.* The authority for the NEPDG terminated at the end of the 2001 fiscal year, September 30, 2001. *See* Bush Mem. at 2.

As alleged in Judicial Watch's Complaint, from the start, the NEDPG gained the attention of the national media. In particular, the public demand for information about the energy policy development process and identity of the participants in that process has been great. That attention has only intensified with the recent controversy over the highly publicized bankruptcy of the Enron Corporation and allegations of contacts between former Enron Chief Executive Officer Kenneth Lay and the NEDPG. Both plaintiffs allege that private individuals and corporations had access to the NEPDG and participated as members of the NEPDG. Sierra Club also alleges that Sub–Groups of the NEPDG were created, which also had private individual members. Both plaintiffs made requests on behalf of their members for information about the NEPDG and had those requests denied by defendants.

## II. Procedural History of the Judicial Watch and Sierra Club Lawsuits

On June 25, 2001, plaintiff Judicial Watch wrote to Vice President Cheney expressing its opinion that the NEDPG was required to comply with FACA, asking to attend all future NEPDG meetings, and requesting copies of minutes and other documents under FACA and FOIA. Judicial Watch is a self-described non-profit public interest law firm the mission of which includes promoting open government. The Office of the Vice President responded by letter on July 5, 2001 denying Judicial Watch's request and informing Judicial Watch that the NEPDG was not subject to either FACA or FOIA.

On July 16, 2001, Judicial Watch filed this lawsuit. Judicial Watch initially sued only the NEDPG, alleging violations of FACA and FOIA. After receiving several extensions of time to file a responsive pleading from this Court, on October 17, 2001, defendant NEPDG moved to dismiss. Defendant NEPDG originally argued that Judicial Watch's complaint failed to state a claim under FACA because the NEPDG consisted solely of federal officials, and that it would violate Article II of the Constitution to apply FACA to this group.

On January 31, 2002, this Court issued an Order setting forth constitutional issues to be briefed in advance of a hearing on the NEPDG's motion to dismiss. That briefing was completed on February 11, 2002. On February 12, 2002, this Court held a hearing at which the Court discussed with government's counsel several problems with the briefs filed by the government in this case. First, although moving to dismiss the complaint, the government had attached and relied on evidence outside the Complaint to support its arguments. This Court inquired why it should not convert the government's motion to a motion for summary judgment pursuant to Federal Rules of Procedure 12 and 56 and proceed immediately to discovery. Fur-

thermore, the Court discussed several serious deficiencies in the legal arguments raised by the government, particularly the government's failure to cite controlling adverse authority from the D.C. Circuit on the issue of mootness, despite government's counsel having also been counsel in those cases. In addition, the Court discussed what appeared to be government counsel's mischaracterization of Supreme Court precedent on the constitutional separation of powers issue. Defense counsel conceded that it had argued for the application of a constitutional standard that did not reflect controlling law without informing the Court that it was doing so. *See* Tr. 2/12/2002 at 33:17 – 34:1; 35:8 – 35:23; 36:15 – 38:7; 38:20 – 39:1; 39:9 – 40:16.

At that hearing, government's counsel admitted to this Court that the briefs submitted did not represent the government's best efforts, and requested further opportunity to research and brief the important issues raised by this case. Plaintiff also requested the opportunity to amend its complaint to include additional defendants, in light of arguments made by the government with respect to the termination of the sole defendant NEPDG. Despite the serious inadequacies in the government's briefing to date, the Court found that it was in the interest of justice to allow the plaintiff to amend its complaint and the defendant to re-brief its motion to dismiss.

Judicial Watch filed its First Amended Complaint on February 15, 2002, naming Vice President Cheney, the NEPDG, several Cabinet members, and several private individuals as defendants. The federal defendants moved to dismiss the Amended Complaint. Defs.' Mot. of 3/8/02. For the first time, the federal defendants argued, among other things, that Judicial Watch's complaint should· be dismissed because FACA affords no private cause of action. Three of ·the private defendants also moved to dismiss the Amended Complaint on the grounds that neither FACA or FOIA apply to private individuals.

On January 25, 2002, Sierra Club filed suit against Vice President Cheney, the NEPDG, and various agency officials pursuant to the APA, the federal mandamus statute, and FACA in the United States District Court for the Northern District of California. The government moved to transfer that case to this Court. While awaiting the decision of the Northern District of California on the transfer motion, Sierra Club and Natural Resources Defense Council ("NRDC") were granted leave to file amicus briefs in the Judicial Watch case. On March 21, 2002, the Northern District of California transferred the Sierra Club case to this Court, where it was filed as a related case to the Judicial Watch case. This Court ordered the two cases consolidated under one case number and set forth an expedited briefing schedule.

On April 5, 2002, the federal defendants moved to dismiss the Sierra Club complaint, raising many of the same issues as in their motion to dismiss Judicial Watch's First Amended Complaint. Defs.' Mot. of 4/5/02. In addition, the federal defendants also argued for the dismissal of Sierra Club's claims pursuant to the APA and the federal mandamus statute. Briefing in both cases was completed on April 29, 2002.

This Court held oral argument on the federal defendants' motions to dismiss on May 23, 2002. After hearing argument from both plaintiffs, amicus NRDC, and the federal government, the Court made several rulings by Order issued that same day. First, the Court granted plaintiff Judicial Watch leave to file a second amended complaint to include claims under the APA and the federal mandamus statute that were in substance identical to

Sierra Club's claims under those statutes. Second, this Court ordered that it would consider federal defendants' motion to dismiss the Sierra Club complaint and the motion to dismiss Judicial Watch's Second Amended Complaint, along with any supplemental arguments the government would add in the time allotted. Third, the Court granted defendants' motion to dismiss the APA claims against Vice President Cheney and the NEPDG. Fourth, the Court denied all other aspects of the motions to dismiss at that time. Fifth, the Court ordered that this Memorandum Opinion, explaining the Court's decision on the motions to dismiss, would be issued promptly. Finally, the Court ordered the parties to begin to develop a proposed discovery plan, which would be filed soon after this Memorandum Opinion was issued.

On May 28, 2002, Judicial Watch filed a Second Amended Complaint, incorporating the language of Sierra Club's APA and mandamus claims.[3] On June 3, 2002 the federal defendants moved to dismiss, incorporating by reference the arguments made in their motions to dismiss of March 8, 2002 and April 5, 2002. Judicial Watch filed an opposition to that motion, similarly incorporating arguments made in previous filings.

**III. Other NEPDG-related Cases Before this Court**

In addition to the two consolidated suits before this Court, the activities of the NEPDG are the subject of several other lawsuits and congressional inquiries. Several other FOIA cases are pending before this Court. *See, e.g., Judicial Watch v. Department of Energy,* Civ. Action No. 01–981(PLF); *Natural Resources Defense Council v. Department of Energy,* Civ. Action No. 01–2545(PLF). The agency defendants in those FOIA cases have been ordered by this Court to produce responsive documents, and have begun to do so, thereby revealing more information about the operations of the NEPDG than was available at the outset of either of these consolidated cases.

In addition, the General Accounting Office (GAO), on behalf of Congress, filed suit in this Court challenging the White House's refusal to turn over information about NEPDG to GAO pursuant to GAO's investigatory authority. *See Walker v. Cheney,* Civ. Action No. 02–0340(JDB). Information released as a result of these cases may potentially impact the statutory and constitutional issues raised by this case.

**DISCUSSION**

**I. Standard of Review**

This Court will not grant the defendants' motions to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994). "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Furthermore, a motion to dismiss is intended to test the sufficiency of the com-

---

**3.** Count III of Judicial Watch's Second Amended Complaint exceeded the scope of this Court's order permitting the amendment, as it was also brought against the private defendants who do not appear in the Sierra Club lawsuit. Consequently, this Court dismissed Count III with respect to the private defendants only. *See* Order of May 31, 2002.

plaint and the complaint alone.[4] *See, e.g., Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Tele-Communications of Key West v. U.S.,* 757 F.2d 1330, 1335 (D.C.Cir.1985) ("a Rule 12(b)(6) disposition must be made on the face of the complaint alone"). Accordingly, at this stage in the proceedings, the Court must accept as true all of the complaints' factual allegations. *See Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1102 (D.C.Cir.1985). Plaintiffs are entitled to "the benefit of all inferences that can be derived from the facts alleged." *Kowal,* 16 F.3d at 1276.

## II. Federal Defendants' Motions to Dismiss

### A. Mootness

 The federal defendants have moved to dismiss both complaints as moot because the NEPDG terminated pursuant to the terms of the Presidential Memorandum on September 30, 2001. Because at least two forms of relief, an injunction requiring the disclosure of records and a declaration that the government violated FACA, are available, these cases are not moot. *See Cummock v. Gore,* 180 F.3d 282 (D.C.Cir.1999); *Byrd v. EPA,* 174 F.3d 239 (D.C.Cir.1999). Furthermore, because Judicial Watch has alleged in its Second Amended Complaint that on information and belief the NEPDG is continuing to operate despite the termination of its mandate in the Presidential Memorandum, Judicial Watch's claims are not moot.

 It is well settled that the exercise of judicial power authorized by Article III of the U.S. Constitution depends on the existence of a case or controversy. *See, e.g., Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975). A case is moot when it "has lost its character as a present, live controversy of the kind that must exist if [the court] is to avoid advisory opinions on abstract questions of law." *Schering Corp. v. Shalala,* 995 F.2d 1103, 1106 (D.C.Cir.1993). Article III is satisfied when, as here, the existence of a "partial remedy" is "sufficient to prevent [a] case from being moot." *Calderon v. Moore,* 518 U.S. 149, 150, 116 S.Ct. 2066, 135 L.Ed.2d 453 (1996).

1. *Judicial Watch's Allegations of the Ongoing Existence of the NEPDG*

Judicial Watch's Second Amended Complaint alleges that "[o]n information and belief, the NEPDG is still in existence." Jud.Watch Sec.Amend.Compl. at § 38. The Complaint then alleges that NEPDG members and staff continue to meet to discuss and formulate energy policy. *Id.* However unlikely, this Court can not determine at this stage of the case whether or not this allegation is true, but rather *must* accept it as true for purposes of deciding this motion to dismiss. *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683. The federal defendants argue in response that "[t]here can be no question that, as a matter of law, the NEPDG no longer exists." Defs.' Mot. of 3/8/2002 at 9. This argument misses the mark. Plaintiff Judicial Watch is not arguing that the legal authority for the NEPDG continues, but that the NEPDG has continued to meet despite the termination of its legal authori-

---

4. In response to the initial Judicial Watch Complaint, the NEPDG attempted to rely on facts outside the Complaint to support its motion to dismiss, *see* Defs.' Br. of 2/5/2002 at 9. However, the federal defendants do not rely on materials outside the complaints in the motion filed in response to Judicial Watch's First and Second Amended Complaints, or Sierra Club's complaint and thus this Court need no longer consider the issue of whether conversion to a summary judgment motion is appropriate pursuant to Rules 12(b)(6) and 56.

ty. The continued existence of the NEPDG is not, as defendants contend, a question of law, but is a question of fact that is clearly in dispute.

In the alternative, the federal defendants argue that even if the ongoing existence of the NEPDG is a question of fact, this Court should not accept this fact as true because it is not "well-pled." Defs.' Mot. of 3/8/2002 at 9 n. 4. Defendants argue that where there is a disparity between facts alleged in a complaint, and exhibits submitted by the plaintiff in support of the complaint, the exhibit trumps the allegation. *Id.* (citing cases). Defendants point out that the letter attached to Judicial Watch's Second Amended Complaint and cited by Judicial Watch to support its allegation of an October 2001 meeting between NEPDG staff and Enron representatives actually states that the meeting occurred "after the termination of the Group." Jud.Watch Sec.Amend. Compl.Ex. 11, at 2. Defendants are correct that this letter clearly states that this meeting occurred after the NEPDG's termination. Regardless, defendants' argument that Judicial Watch's Second Amended Complaint is not well-pled fails to acknowledge that the Amended Complaint does not simply allege that this one meeting occurred, but that "[o]n information and belief, other meetings between both federal and non-federal members of the allegedly defunct NEPDG have occurred and are still occurring to this day to continue discussions on formulating a national energy policy." Jud.Watch Sec. Amend.Compl. at ¶ 38. At this stage of the proceedings, prior to any discovery, this Court *must* accept these facts as true, no matter how vigorously defendants contest the truthfulness of these allegations.

If the NEPDG does continue to exist and meet to formulate energy policy, this Court can still award the relief requested by Judicial Watch. Therefore, because Judicial Watch has alleged the ongoing existence of this group, none of Judicial Watch's claims are moot.

### 2. *Even if the NEPDG no Longer Exists, These Claims are Not Moot.*

Unlike Judicial Watch, Sierra Club does not allege that the NEPDG continues to exist, but concedes that the NEPDG terminated on September 30, 2001. However, even if in fact the NEPDG ceased to exist on September 30, 2001, Judicial Watch and Sierra Club's requests for documents and declaratory relief are not moot.

### a. *Injunctive Relief*

■ Both plaintiffs have requested that this Court order the release of documents related to the NEPDG's activities as relief for the alleged violations of FACA. Jud. Watch Sec.Amend.Compl. at 22, ¶ 5, 6; Sierra Club Compl. at ¶ 36. FACA mandates public access to some records of advisory committees:

> Subject to [the requirements of FOIA] the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents, which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying . . .

5. U.S.C.App. 2 § 10(b). This provision "affirmatively obligates the Government to provide access to the identified materials." *Food Chem. News v. Dep't of Health and Human Servs.*, 980 F.2d 1468, 1472 (D.C.Cir.1992); *see also Cummock v. Gore*, 180 F.3d 282, 289 (D.C.Cir.1999). Furthermore, this public access provision applies even where there has been no specific request made, unless "the agency reasonably claims [the materials] to be exempt from disclosure pursuant to FOIA." *Food*

*Chem. News,* 980 F.2d at 1469; *see also Cummock,* 180 F.3d. at 289. However, this provision does have a time limitation: the documents, "shall be available for public inspection and copying . . . *until the advisory committee ceases to exist."* 5 U.S.C.App. 2 § 10(b) (emphasis added).

The federal government's statutory duty under FACA to allow the public to inspect and copy documents may be limited in time by the statute, but the ability of a court to award access to the documents as relief for previous violations of that duty is limited only by the existence of the documents. The terms of the statute create the substantive requirements to which the government must adhere—the government must make documents available only while an advisory committee exists. Here, both plaintiffs have properly alleged that the government failed to make documents available during the life of the NEPDG. Whether or not plaintiffs sued before or after the group terminated does not alter the allegation that the government failed to meet the substantive requirements of the statute during the relevant timeframe. Assuming the facts in the complaints to be true, the government violated the public access provisions of the statute. Contrary to the federal defendants' argument here, the terms of the statute limit the scope of liability, not the availability of a remedy.

The Court is free to exercise its discretion to craft equitable relief addressing statutory violations. Indeed, if after discovery this Court determines that a statutory violation has occurred, the Court *must* provide some form of relief. *See, e.g., U.S. v. Oakland Cannabis Buyers' Cooperative,* 532 U.S. 483, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001). Here, one alleged violation is a failure to provide access to documents during the lifetime of the NEPDG. This Court, in its discretion, could determine at some later date that ordering defendants to provide whatever relevant documents still exist is an appropriate remedy for that violation.

Thus, whether the relief is available is contingent not on the continued existence of the group, but on the continued existence of the records and information.[5] In other cases, plaintiffs' claims for documents pursuant to § 10(b) were eventually rendered moot not by the termination of the advisory group but only when the defendants released the documents. *See, e.g., Byrd v. EPA,* 174 F.3d 239 (D.C.Cir. 1999); *Physicians Comm. for Responsible Medicine v. Glickman,* 117 F.Supp.2d 1 (D.D.C.2000); *Ass'n of Am. Physicians and Surgeons v. Clinton,* 879 F.Supp. 103 (D.D.C.1994).

The D.C. Circuit has held that a request for documents pursuant to FACA is not rendered moot by the termination of the advisory committee in question. *Cummock v. Gore,* 180 F.3d 282 (D.C.Cir.1999). In *Cummock,* the D.C. Circuit reversed a district court opinion that in part dismissed the plaintiff's claim because her request for documents was untimely. The Court held that Cummock had an enforceable right to the documents that were denied to her during the committee's existence and remanded for the District Court to determine precisely what information Cummock was entitled. 180 F.3d at 292–93. The primary argument by the government in *Cummock* was that the plaintiff, as a member of the advisory committee in question, had no cause of action under FACA for access to records. The Court rejected the government's argument, hold-

---

5. At the hearing on February 12, 2002, when government's counsel acknowledged that relevant documents still exist, this Court ordered the government to maintain those documents for the duration of this lawsuit.

ing that a member of an advisory committee has an even greater right of access than does the public under § 10(b), but in so holding discussed the parameters of the public's right. The Court explained:

> In any event, the Government does not dispute that committee members have at least the same rights under FACA as the public. Although we disagree with the Government's position that the rights of a committee member extend no further than the rights of a non-member, even taking only this limited view, the Government's concession is significant. *Because there is no question under our precedent that members of the public possess enforceable rights to obtain information under FACA, see Food Chem. News,* 980 F.2d at 1472, it follows a fortiori that committee members have at least these same rights. *And we have also made it clear that FACA rights are enforceable even after an advisory committee has been disbanded. See, e.g., Byrd,* 174 F.3d 239, 243–44 (rejecting argument that plaintiff's injury was not redressable where panel had already completed its work and been disbanded).

180 F.3d at 292 (emphasis added).

The holding of the D.C. Circuit in *Cummock* is clear: "Cummock clearly possesses an enforceable right to information under FACA, because any member of the public possesses such a right. Moreover, Cummock possesses an even greater right than a member of the public, because, as a Commission member, she is entitled to fully participate. . . ." *Id.* at 292. In so holding, the D.C. Circuit was attempting to be faithful to legislative intent. With respect to the public access provision, § 10(b), the legislative history explains:

> This provision has the effect of assuring openness in the operations of advisory committees. This provision coupled with the requirement that complete and accurate minutes of committee meetings be kept serves to prevent the surreptitious use of advisory committees to further the interests of any special interest group. Along with the provisions for balanced representation contained in Sec. 4 of the bill, this requirement of openness is a strong safeguard of the public interest.

H.R.Rep. 92–1017, *reprinted in* 1972 U.S.C.C.A.N. at 3491. The surreptitious use of advisory committees by special interest groups could necessarily result in a lack of knowledge about the group's activities, as exemplified by the allegations in this case. It is entirely conceivable that only after the fact would the public become aware of a group's existence and activities, and only after the fact could the public then claim its right of access to documents. In addition, mandating that a court's ability to enforce the FACA record-keeping requirement ends with the termination of the advisory committee would create an odd incentive for the government to terminate any problematic advisory group to avoid shedding light on its activities.

Defendants try to distinguish *Cummock* by arguing that *Cummock* applies only to suits by members of an advisory committee. *See* Defs.' Mot. of 3/8/2002 at 10. But the passage cited above clearly assumes for sake of argument that "that the rights of a committee member extend no further than the rights of a non-member," and then states that "members of the public possess enforceable rights to obtain information under FACA" and that "FACA rights are enforceable even after an advisory committee has been disbanded." 180 F.3d at 292. Furthermore, the Court held that "Cummock clearly possesses an enforceable right to information under FACA, because any member of the public possesses such a right." *Id.* Contrary to defendants' argument, these conclusions

are not dicta, but are central to the D.C. Circuit's reasoning and holding. In order to determine what rights Cummock possessed, the Court reasoned that Cummock must have at least as many rights as the public, which include the right to documents after the committee has been disbanded.

Finally, defendants argue that *Cummock* cites only one case, *Byrd v. EPA*, 174 F.3d 239 (D.C.Cir.1999), to support the conclusion that a claim for documents is not moot beyond the life of the committee, and therefore is limited to the scope of Byrd. Byrd held that a request for declaratory relief under FACA was not mooted by the dissolution of the advisory committee at issue. *Id.* at 244. Thus, defendants argue that *Cummock's* citation to *Byrd* "can only be understood to be a reference to the limited declaratory relief at issue in *Byrd.*" Defs.' Mot. of 3/8/02 at 11 n. 7. Defendants fail to recognize that the D.C. Circuit in *Cummock* extended the general proposition in *Byrd* that relief can exist beyond the life of the committee to claims for other relief. Insofar as *Cummock* is an extension of the holding in *Byrd,* it is an extension that is binding on this Court.

Defendants also argue that after the termination of an advisory committee, FOIA provides the only statutory right of access to documents. In the absence of a FACA violation, this may be an accurate statement. If the government complies with FACA, and provides documents in a reading room until the committee ceases to exist, and a citizen wants to access those documents at some time after the termination of the committee, that citizen would have to file a FOIA request to a proper agency defendant for those documents. But that scenario is not what plaintiffs have alleged here. When the government violates FACA, the question is not what other statutes could also provide a right of access, but what options are available to this Court to remedy that statutory violation.

Finally, defendants also argue that plaintiffs' claims are moot because they did not request a preliminary injunction to preserve the records at issue here. Indeed, plaintiffs could have moved for a preliminary injunction to require defendants to maintain the relevant documents. However, plaintiffs were in no way required to request such preliminary relief in order to maintain the controversy. Relief is available as long as relevant documents exist.

b. *Declaratory Relief*

■ Defendants also argue that plaintiffs' request for a declaratory judgment that defendants violated FACA is moot. Defendants argue that, because all other claims for relief are moot, the claim for declaratory relief cannot survive alone, *citing City of Houston v. Dep't of Housing & Urban Dev.*, 24 F.3d 1421, 1429 (D.C.Cir. 1994). As explained above, the claims for injunctive relief regarding the documents are not moot in this case, so this argument by defendants fails. However, even if all the other claims for relief were moot, this Court would follow the D.C. Circuit's holding in *Byrd* that a claim for declaratory relief is not mooted by the termination of the committee. 174 F.3d 239 (D.C.Cir. 1999).

In conclusion, Judicial Watch's claims are not moot because it has alleged the ongoing existence of the NEPDG. Regardless of the likelihood of the truth of these allegations, this Court must accept them as true for purposes of deciding these motions. In addition, Sierra Club's claims are not moot because this Court can remedy any alleged violations of FACA, the APA, and the mandamus statute with injunctive and declaratory relief.

## B. FACA Claims

### 1. *FACA Provides No Private Cause of Action*

Both Judicial Watch and Sierra Club allege that the activities of the NEPDG are subject to FACA because the group was established by the President to provide advice on energy policy, and had members who were not full-time federal employees. Both Judicial Watch and Sierra Club further allege that the activities of the NEPDG violated all the procedural requirements of FACA by failing, for example, to provide public notice of meetings, public access to meetings, and public access to minutes and documents generated by the NEPDG. Sierra Club also alleges that in addition to the NEPDG, defendants established and utilized "Sub-Groups" of the NEPDG, which also had private members and which also were subject to and violated FACA's requirements.

In response to these allegations, defendants argue that Judicial Watch and Sierra Club's claims pursuant to FACA should be dismissed because there is no private right of action under FACA.[6] While both Sierra Club and amicus NRDC concede that there is no private cause of action under FACA, Judicial Watch contends that there is. However, in the event that this Court should be convinced by the government's argument with respect to FACA, at oral argument Judicial Watch requested and was granted leave to amend its complaint to include claims under the APA and federal mandamus statute.

▮▮▮▮ Notwithstanding the many previous cases in which courts have implicitly recognized a private right of action pursuant to FACA, in light of the Supreme Court's recent decision in *Alexander v.*

*Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), this Court has no choice but to hold that FACA creates no private right of action. *Sandoval* makes very clear that courts can not read into statutes a cause of action that has no basis in the statutory text. 532 U.S. at 286–87, 121 S.Ct. 1511 ("Statutory intent on this latter point is determinative. . . . Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.") (internal citations omitted). The *Sandoval* Court rejected any attempt to "revert in this case to the understanding of private causes of action that held sway 40 years ago" that would allow courts to imply a cause of action where consistent with the purpose of the statute at issue. *Id.* Regardless of how allowing such a private cause of action may further the purposes of FACA, nothing in the text of FACA supports a private right to sue. The statutory language may create rights and duties that have been recognized by courts in the past. *See, e.g., Cummock v. Gore,* 180 F.3d 282 (D.C.Cir.1999). However, language that creates a right is insufficient to create a right to sue. The *Sandoval* Court made clear that the statute must provide not only a private right but also a private remedy. 532 U.S. at 286–87, 121 S.Ct. 1511.

Nothing in the language of FACA evidences any intent to create such a remedy. Precedent does not require this Court to hold otherwise. It is true that several cases have been brought pursuant to FACA apparently without incorporating the FACA violation into a corresponding APA claim. *See, e.g., Public Citizen v. Dep't of Justice,* 491 U.S. 440, 109 S.Ct.

---

**6.** Defendants did not make this argument in their original motion to dismiss the Judicial Watch claims, but raised it only in response to Judicial Watch's First Amended Complaint. *See* Defs.' Mot. of 3/8/02.

2558, 105 L.Ed.2d 377 (1989); *Cummock v. Gore*, 180 F.3d 282 (D.C.Cir.1999); *Ass'n of Am. Physicians and Surgeons v. Clinton*, 997 F.2d 898 (D.C.Cir.1993). Apparently, in all of these cases, the courts assumed that FACA provided a cause of action. None of the cases addressed the issue of whether Congress created a private right to sue under FACA. This Court cannot rely on an implicit assumption, even an assumption made by the Supreme Court, when a later Supreme Court decision makes clear that the requisite statutory language is lacking here.

However, defendants overstate the amount of precedent that supports their position that a plaintiff must sue under the APA to enforce FACA. Defendants cite cases from the D.C. Circuit, *Claybrook v. Slater*, 111 F.3d 904, 908–09 (D.C.Cir. 1997), *Animal Legal Defense Fund v. Shalala*, 104 F.3d 424, 430 (D.C.Cir.1997), *Washington Legal Found. v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1450 (D.C.Cir. 1994), and one case from this Court, *Fertilizer Institute v. EPA*, 938 F.Supp. 52, 54 (D.D.C.1996), for the proposition that "judicial review of FACA claims is available only through the APA." Defs.' Reply of 4/26/02 at 5. Yet none of the D.C. Circuit cases cited by defendants hold this.[7]

The *Fertilizer Institute* case does clearly hold that "[s]ince FACA contains no provision for judicial review, the availability if such review must derive from the APA." 938 F.Supp. at 54. However, one other case from this Court, cited by plaintiff Judicial Watch, holds the opposite: that FACA does create a private cause of action. *Washington Legal Found. v. American Bar Ass'n Standing Comm. on the Fed. Judiciary*, 648 F.Supp. 1353, 1361 (D.D.C.1986).

Notwithstanding the relative confusion that exists within the FACA doctrine with respect to this question, the Supreme Court's standard is now clear: this Court cannot read into a statute a cause of action that Congress has not expressly created. *Sandoval*, 532 U.S. at 286, 121 S.Ct. 1511. Consequently, Judicial Watch and Sierra Club's claims pursuant to FACA must be dismissed.

## C. APA Claims

Plaintiffs allege that by failing to comply with FACA, the defendants have acted arbitrarily and capriciously, not in accordance with law, and without observation of procedure required by law, in violation of the APA. 5 U.S.C.

---

7. *Claybrook v. Slater* involved a challenge under FACA to the decision of an agency representative not to adjourn an advisory committee meeting. 111 F.3d at 906. The D.C. Circuit affirmed the District Court's dismissal of the action for lack of standing, reasoning that the plaintiff had no legally cognizable injury because the action at issue was committed to agency discretion. *Id.* In so holding, the Court stated, "the Administrative Procedure Act ... governs judicial review of agency actions." *Id.* at 908. While the D.C. Circuit did analyze that FACA claim, brought against the Federal Highway Administration, under the APA, it did not hold that a FACA claim was *only* available under the APA. The case says nothing about whether and how FACA claims brought against entities in the government that are not agencies for APA purposes can proceed.

Neither *Animal Legal Defense Fund v. Shalala* nor *Washington Legal Foundation v. U.S. Sentencing Commission* address the availability of a private right of action under FACA. 104 F.3d 424, 17 F.3d 1446. The language with respect to the APA incorrectly cited by defendants here, comes from a discussion of whether the Sentencing Commission qualifies as an "agency" for purposes of FACA. FACA incorporates the definition of "agency" used in the APA; thus, with respect to what qualifies as an agency, the APA "determines FACA coverage." 104 F.3d at 430. Neither of these cases addresses whether FACA contains a private right to sue.

§ 706(2)(A) and (D) ("The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law ... (D) without observance of procedure required by law"). Defendants argue that plaintiffs have failed to state a claim under the APA because many of the defendants are not "agencies" and therefore not liable pursuant to the APA. For those defendants that are covered by the APA, defendants argue that plaintiffs have not identified the requisite "final agency action."

Plaintiffs' APA claims against two of the named defendants, Vice President Cheney and the NEPDG, were dismissed by this Court on May 23, 2002. Plaintiffs have alleged sufficient final agency action with respect to the remaining agency defendants for this Court to deny the motions to dismiss.

### 1. *Non–Agency Defendants*

Judicial Watch and Sierra Club have named as defendants the following: Vice President Richard Cheney, the NEPDG, Andrew Lundquist, Executive Director of NEPDG and Director of Energy Policy for Cheney and Senior Policy Advisor to the DOE, Spencer Abraham, Secretary of DOE, Donald Evans, Secretary of Commerce, Gale Norton, Secretary of the Interior, Ann Veneman, Secretary of Agriculture, Paul O'Neill, Secretary of the Treasury, Norman Mineta, Secretary of Transportation, and Christine Todd Whitman, Administrator of the EPA. Defen-

dants argue that the Vice President, the NEPDG, and any alleged NEPDG subgroups are not "agencies" for purposes of the APA.

### a. *Vice President Cheney*

Sierra Club [8] concedes that Vice President Cheney is not an agency for purposes of the APA. Sierra Club's Opp'n at 7 n. 3. Thus, this Court need not resolve the question of whether the Vice President may ever be an "agency" for purposes of the APA, thereby avoiding a difficult constitutional question. *See Public Citizen v. Dep't of Justice*, 491 U.S. 440, 466, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (emphasizing doctrine of constitutional avoidance); *cf. Franklin v. Massachusetts*, 505 U.S. 788, 800–01, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (holding that separation of powers concerns prevent the application of the APA to the President); *Meyer v. Bush*, 981 F.2d 1288, 1295 (D.C.Cir.1993) (suggesting that the Vice President should not be subject to FOIA).

### b. *NEPDG*

Because Sierra Club has conceded that the NEPDG no longer exists, any APA claim brought directly against the NEPDG must be dismissed. Even though Sierra Club's FACA claims with respect to the federal defendants are not moot, if the NEPDG no longer exists, then it can not be sued as a defendant. Thus, the Court need not resolve the question of whether the NEPDG or its alleged sub-groups were sufficiently independent to qualify as an "agency" for purposes of the APA.[9]

---

8. Judicial Watch has opposed the federal defendants' motion to dismiss its Second Amended Complaint by incorporating by reference the arguments previously made in its opposition briefs and the briefs of Sierra Club and NRDC. *See* Jud.Watch Opp'n of 6/7/02. Because Judicial Watch has adopted Sierra Club and NRDC's arguments with respect to the APA claims in their entirety, the concessions made by Sierra Club and NRDC with respect to these claims similarly apply to Judicial Watch.

9. Furthermore, Sierra Club admits that it included the NEPDG as a defendant "in order

### 2. Agency Defendants and Final Agency Action

██ Defendants concede that the cabinet members sued by plaintiffs are agency actors, and can generally be sued pursuant to the APA for agency action. Defs.' Mot. of 4/5/02 at 12. Section 704 of the APA states that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. It is uncontested that the actions in question are not made reviewable by statute, so in order to state a claim under the APA, plaintiffs must identify a "final agency action." Defendants argue that the APA claims against these agency defendants must be dismissed because plaintiffs have not done so.

Plaintiffs argue that the agency heads named as defendants established and utilized the NEPDG and the NEPDG Sub–Groups and that the "agencies under the control of the named agency defendants have denied [plaintiffs] access to proceedings and records". Sierra Club's Opp'n of 4/16/02 at 9. To be specific, the particular FACA violations alleged to have been caused by defendants are:

- Failure to open each meeting to the public.

- Failure to publish timely notice of each meeting in the Federal Register

- Failure to allow public attendance or statements before the meetings

- Failure to make available for public inspection and copying the records of the NEPDG.

- Failure to keep detailed minutes of each meeting.

- Establishing Sub–Groups without Presidential authorization or notice in Federal Register.

- Failure to file an advisory committee charter.

Sierra Club Compl. at ¶ 31; Judicial Watch Sec.Amend.Compl. at ¶ 54.

The question before this Court is twofold: whether the actions or lack thereof that caused the alleged FACA violation are "agency action," and whether those actions or inactions are "final." Plaintiffs allege that the agency defendants were at least in part responsible for the decision-making processes that lead to the FACA violations. Specifically, Sierra Club alleges that the various agency defendants "participated in" the NEPDG meetings and deliberations, and "gathered information, advice, and recommendations on national energy policy and supervised the work of the [NEPDG]." Sierra Club's Compl. at ¶¶ 9 – 15. Furthermore, "defendants arranged, participated in and exercised responsibility over meetings and other activities involving [Task Force Sub–Groups]." Id. at ¶ 18. In addition, Sierra Club alleges that the "participants in [NEPDG] and the Task Force Sub–Groups interacted significantly and acted collectively in expressing their viewpoints and advice on energy policy." Id. at ¶ 20. Sierra Club also alleges that "[t]he [NEPDG] and the Task Force Sub–Groups were established or utilized by the President and the defendants." Id. at ¶ 23. Finally, "defendants have refused to provide information to Congress, the General Accounting Office, or the public (including the Sierra Club) concerning" the NEPDG. Id. at ¶ 24.

Plaintiffs are entitled to the benefit of all inferences from the facts alleged. From the allegation that defendants caused these

to preempt any 'shell game' tactic defendants may employ to withhold Task Force records,

and for the sake of clarity." Sierra Club's Opp'n of 4/16/02 at 8 n. 6.

violations it could be possible that the group comprised of the agency defendants, the Vice President, and private individuals acted collectively to make the decisions to hold meetings that were not open to the public, to hold meetings for which minutes were not kept and were not made public, to hold meetings for which no notice was published in the Federal Register, to create draft reports and other records that were not made public, and to meet and work on policy recommendations without filing an advisory committee charter. Given the structure of the NEPDG outlined in the Presidential Memorandum, it is possible, or even likely that these decisions were not made collectively, but in fact were made by the Vice President acting as the head of the group. However, "[i]ndeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). This Court will not grant a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) unless a plaintiff can prove no facts in support of his claim. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994). Here, if plaintiffs can prove that decisions were made collectively by this group, those can constitute agency action for purposes of the APA.

Furthermore, in addition to holding meetings of the NEPDG that allegedly violated FACA's access requirements, plaintiffs also allege that the agency defendants established and controlled the Task Force Sub–Groups. Plaintiffs allege that these Sub–Groups, comprised of NEPDG members and private individuals, also constituted advisory committees for purposes of FACA and also operated in violation of FACA and the APA. Specifically, Sierra Club alleges that "defendants arranged,

participated in and exercised responsibility over meetings and other activities involving [Task Force Sub–Groups]." *Id.* at ¶ 18. Judicial Watch similarly alleges that defendants established the Sub–Groups. Jud.Watch. Sec.Amend.Compl. at ¶ 54(f). Once again, it is possible reasonably to infer from these allegations that an agency head, or a group of agency heads collectively or individually made the decision to establish and oversee particular Sub–Groups.

In response, the federal defendants argue that the decisions of the NEPDG were made by the President, who established the group, and the Vice President, who ran the group, rather than the agency participants. The assertion that no relevant decisions were made by the agency heads is a question of fact that cannot be determined without discovery. The fact that the Presidential Memorandum that established the NEPDG delegated authority to the Vice President to head the NEPDG is not conclusive with respect to how decisions were actually made. Did the Vice President set the dates and times of the meetings? Did the group collectively come to a decision to hold a meeting or conduct other activities? If these Sub–Groups did in fact exist, who made the decision to establish them? Who made the decision as to when and where the Sub–Groups would meet, and what role they would play in the policy-making process? Construing the facts in the light most favorable to plaintiffs, this Court must assume for purposes of this motion that the decisions at issue were made in part by the agency defendants.

Thus, the question before this Court is whether collective decisions by such a group, including several agency heads, to hold meetings that allegedly violated the FACA requirements and to establish and control Task Force Sub–Groups, can be

considered first, agency action, and second, final agency action pursuant to the APA. Defendants argue, "[i]n the context of advisory committees, the agency that charters a committee and to which a committee reports can engage in final agency action, but individual members of an advisory committee cannot." Defs.' Reply of 4/26/02 at 12. Defendants' primary justification for why the actions of the agency heads cannot be considered agency action is that these individuals acted only as participants in a policy-making group, and were not making decisions on behalf of their agencies.

According to § 10 of the APA, 5 U.S.C. § 701(b)(2), "agency action" has the meaning given to it by 5 U.S.C. § 551. That definition of " 'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13). That section further defines "order" as "the whole or a part of a final disposition ... of an agency in a matter other than rule making...." 5 U.S.C. § 551(6). According to the legislative history of the APA:

> The term 'agency action' brings together previously defined terms in order to simplify the language of the judicial-review provisions of section 10 and to assure the complete coverage of every form of agency power, proceeding, action, or inaction. In that respect the term includes the supporting procedures, findings, conclusions, or statements or reasons or basis for the action or inaction.

S.Doc. No. 248, 79th Cong., 2d Sess., 255 (1946). As the D.C. Circuit has explained, "the Act defines agency action as 'the whole or a part of an agency rule, order, license, sanction, relief, of the equivalent or denial thereof, or failure to act.' .... Id. § 551(13). These categories are im-

precise, and courts have made the threshold determination of reviewable agency action on a case-by-case basis." *Industrial Safety Equipment v. EPA*, 837 F.2d 1115, 1118 (D.C.Cir.1988).

The type of actions and inaction challenged here, creating sub-groups of the Task Force, holding meetings, refusing to disclose documents, failure to comply with FACA's other procedural requirements, certainly fall within the broad category of "agency power" Congress intended to include in this definition of agency action. S.Doc. No. 248, 79th Cong., 2d Sess., 255 (1946) ("to assure the complete coverage of every form of agency power, proceeding, action, or inaction."). The government can not seriously challenge the type of action taken here as not the type of action covered by this definition. Whether that action can be ascribed to an agency, and whether that action is sufficiently final, are two more difficult questions.

If indeed the decisions to hold NEPDG meetings in private and to create and operate the Sub–Groups were made collectively or in part by the agency heads, can these decisions be ascribed to the agencies? This Court can not detect any case law discussing whether an action taken by a Cabinet member in an advisory capacity should be ascribed to the agency for purposes of the APA. Here, the D.C. Circuit's discussion of the difficulty of distinguishing between the dual role of policy advisor and agency head played by Cabinet officials in the context of a FOIA suit in *Ryan v. Dep't of Justice*, 617 F.2d 781 (D.C.Cir. 1980), is helpful.

The question before the D.C. Circuit in *Ryan* was whether documents within the control of the Attorney General and generated for the purpose of advising the President on judicial nominations are "agency records" for purposes of FOIA. The Circuit reversed the District Court's grant of

summary judgment to defendants and ordered the court to enter summary judgment in favor of plaintiffs, holding that such documents were agency records. The D.C. Circuit held that there was no basis for "distinguishing between the Attorney General and the Department of Justice, in such a way that the former is not an 'agency' where he functions in a purely advisory capacity to the President." 617 F.2d at 786–87. The Court emphasized the dual role played by the Attorney General as advisor to the President and administrator of the Department of Justice, and stated "[t]he same dual role would be true, to a greater or lesser extent, of all other Cabinet officers." *Id.* at 787. The Court then held that there was no "meaningful distinction" between documents generated and kept at DOJ on the basis of the dual roles. *Id.*

Similarly, with respect to the APA, there is no statutory basis for distinguishing between actions taken by an agency head as an advisor to the President and actions taken as the administrator of the agency. Just as rendering advice on judicial nominations was within the scope of the Attorney General's power both as an advisor and as the head of the Department of Justice, so too is rendering advice on energy policy within the scope of the dual roles of many of the Cabinet members sued here, particularly the Secretary of Energy. *Id.* at 787. As the D.C. Circuit explained, "[j]udicial nominations are by no means unique as an instance where normal agency functions involve some element of giving advice to the President." *Id.*

The D.C. Circuit held that "[o]nce a unit is found to be an agency, this determination will not vary according to its specific function in each individual case," and "[a]ny unit or official that is part of an agency and has non-advisory functions cannot be considered a non-agency in se-

lected contexts on a case-by-case basis." *Id.* at 788–89. There is a compelling argument for applying this holding of *Ryan* to APA claims. The same difficulties attend to distinguishing between decisions made or actions taken by agency heads in a purely advisory context or as the head of the agency for purposes of the APA. The Secretary of Energy provides the strongest example of such difficulty-soliciting opinions and rendering advice on energy policy to the President is part and parcel of the Secretary's duties as the head of the DOE. It would be unrealistic to say that when involved in a group designed to create energy policy the Secretary of Energy sheds his role as the head of the DOE and acts only as an advisor to the President. Furthermore, these individuals were selected to participate in this policy-making process by virtue of their positions as the various Secretaries of administrative agencies.

Moreover, in addition to the arbitrariness involved in attempting to draw a distinction between the dual roles of Cabinet members, the D.C. Circuit also rejected such line-drawing because it would undermine the purposes of FOIA. *Id.* at 788. So too would such line-drawing, in this case, undermine the purposes of the APA. Given the vast number of agency actions that include an element of advice-giving, to hold that a decision made by the head of an agency while serving in an advisory role to the President is not subject to the APA would render a large number of agency actions unreviewable. This would not comport with Congress' intent to include within the scope of the APA "every form of agency power." S.Doc. No. 248, 79th Cong., 2d Sess., at 255 (1946).

Thus, for the reasons articulated by the D.C. Circuit in *Ryan*, this Court holds that an action that otherwise would qualify for the APA's definition of "agency

action" does not fall outside the coverage of the APA simply because the agency head acts in an advisory capacity to the President. The more important inquiry is whether that action is sufficiently final for APA purposes.

■ The Supreme Court clearly stated the definition of "final agency action" in *Bennett v. Spear*:

As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process, *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948)—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow," *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970).

520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The decisions in question—to create and supervise Task Force Sub–Groups, to hold meetings closed to the public and without complying with the various procedural requirements of FACA—were not tentative or interlocutory. Plaintiffs are not challenging decisions made by low level agency actors that were subject to the review of their supervisors. Plaintiffs are challenging decisions allegedly made on behalf of an agency by the head of that agency. Nothing in the allegations indicates that the actions challenged were later corrected or reversed by the same or other decision-makers. As decisions allegedly made by the head of an agency, these actions marked the consummation of the decision-making process.

Second, these actions determined "rights or obligations" and created "legal conse-

quences." 520 U.S. at 178, 117 S.Ct. 1154. The decisions to hold meetings without public access to the meetings or the records created indeed had a legal consequence—the denial of the public's right of access to that information. Plaintiffs and other interested groups and citizens were prevented from enforcing their right to access information that exists pursuant to FACA. Subsequent actions taken without granting access, and the failure to grant access itself, constitute final agency action.

Defendants argue that recognizing the denial of information as a final agency action confuses the APA standard with FOIA. FACA imposes no requirements on individual committee members, argues defendants, so any denial of information by individual committee members cannot violate the law. Plaintiffs, however, are not challenging an individual denial of access to a particular information request. FACA obligates the government to make open and available to the public the meetings and records of advisory committees generally, without respect to any particular request. That general failure to do so here is what plaintiffs challenge, not the particular response to their particular requests for access. Thus, any particular denial of access to Judicial Watch or Sierra Club is only relevant insofar as it reflects a general denial of public access.

Once again, the standard to be applied by this Court is not whether the factual scenario that describes final agency action is likely to have occurred here. All that is required for plaintiffs to survive defendants' motions to dismiss is for such a factual scenario to be possible. Plaintiffs have alleged sufficiently final agency action here to survive.

### 3. *Andrew Lundquist*

■ Defendants argue that all claims against Andrew Lunquist, sued by both

Judicial Watch and Sierra Club, should be dismissed because Lundquist no longer works for the government. Such a factual determination is inappropriate at this stage of this case. Defendants may be able to establish these facts through discovery. However, this Court can not accept the unsupported factual allegations of defense counsel with respect to Mr. Lundquist's employment status.

**D. Mandamus Statute**

■ Plaintiffs have also sued defendants pursuant to the federal mandamus statute, 28 U.S.C. § 1361, arguing that this Court has the authority to remedy defendants' violation of a nondiscretionary duty created by FACA. The federal mandamus statute states: "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. The parties dispute the meaning of this statute. The federal defendants argue that the mandamus statute cannot provide jurisdiction to hear claims based on a violation of another statute if that other statute does not provide a private cause of action. Plaintiffs argue that the mandamus statute provides both a cause of action and jurisdiction where another statute imposes a non-discretionary duty on a federal official and where no other relief is available.

*1. Cause of Action*

Defendants argue that "[t]he federal mandamus statute may provide jurisdiction for an otherwise existing cause of

action, but it does not provide a plaintiff with a cause of action.... That means a statute that does not provide a right of action cannot be enforced through mandamus." Defs.' Reply of 4/26/02 at 6. While citing a case from this Court to support their argument, *Public Citizen v. Kantor,* 864 F.Supp. 208, 213 (D.D.C.1994), defendants fail to cite controlling authority from the D.C. Circuit, *Chamber of Commerce v. Reich,* 74 F.3d 1322 (D.C.Cir.1996), that holds just the opposite.

The plaintiffs in *Reich* challenged the authority of the President to issue an Executive Order authorizing the Secretary of Labor to disqualify federal employers who hire strike replacements from federal contracts, arguing that the Executive Order was preempted by the National Labor Relations Act (NLRA). The D.C. Circuit held that while the APA did not support plaintiff's challenge to the Executive Order because plaintiffs had not identified any agency action, the Court could review legality of Order on a non-statutory basis. *Id.* at 1327 (*citing* Byse and Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 HARV.L.REV. 308, 321 (1967)).[10] Specifically, the Court held, "[i]f a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action." *Id.* While the D.C. Circuit in *Reich* does not identify the "non-statutory" basis of review as a writ of mandamus or the mandamus statute, the cases it relies upon in this discussion are mandamus cases, and a later D.C. Circuit case, *Washington Legal Foundation v. United States Sentencing*

**10.** The Byse and Fiocca law review article explains that while mandamus actions in federal court are technically statutory actions pursuant to § 1361, they are commonly referred to as non-statutory judicial review actions because of the traditional availability of the writ of mandamus as a source of nonstatutory relief. *See* Byse and Fiocca, 81 Harv. L.Rev. 308, 355 n. 51 (1967).

*Comm'n,* confirmed that indeed *Reich* concerned mandamus. 89 F.3d 897, 901 (D.C.Cir.1996).

Neither plaintiffs nor defendants cited or discussed the *Reich* holding in their briefs, or the issue of whether *Reich* overrules the *Kantor* decision from this Court. Defendants are correct that *Kantor* clearly held that the mandamus statute does not provide a source of review where judicial review is otherwise precluded. 864 F.Supp. at 213. However, regardless of the holding of this Court in Kantor, Reich overrules that decision.

At oral argument, defendants attempted to argue that the Supreme Court's holding in *Sandoval,* 532 U.S. at 286–87, 121 S.Ct. 1511, with respect to the existence of statutory rights of action overrules *Reich.* However, *Sandoval* in no way conflicts with the holding of *Reich.* The *Sandoval* Court was concerned about the constitutionality of an Article III Court reading into a statute a cause of action that Congress had not explicitly created. *Id.* Here, there is no such concern because Congress itself created the mandamus statute.

■■■ Following *Reich,* this Court holds that the mandamus statute may provide an avenue to remedy violations of statutory duties even when the statute that creates the duty does not contain a private cause of action. Accordingly, this Court must now turn to the question of whether FACA creates such a duty.

### 2. *Non–Discretionary Duty*

■■■ When a federal official has an obligation to perform a ministerial or non-discretionary duty, a federal district court may issue a writ of mandamus under § 1361 to compel that officer to fulfill the obligation. *National Wildlife Fed'n v. United States,* 626 F.2d 917, 923 (D.C.Cir. 1980). However, mandamus is a "drastic remedy, to be invoked only in extraordi-

nary situations." *Consolidated Edison Co. of New York v. Ashcroft,* 286 F.3d 600, 605 (D.C.Cir.2002); *In re Papandreou,* 139 F.3d 247, 249 (D.C.Cir.1998). As the Supreme Court has explained, a "ministerial duty" must be "so plainly prescribed as to be free from doubt and equivalent to a positive command.... [W]here the duty is not thus plainly prescribed, but depends on a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus." *Wilbur v. United States,* 281 U.S. 206, 218–19, 50 S.Ct. 320, 74 L.Ed. 809 (1930) (*quoted in Consolidated Edison,* 286 F.3d at 605).

Plaintiff identifies several non-discretionary duties imposed by FACA. However, the only duties that are relevant here are those that are not moot. *See Gray v. Office of Personnel Management,* 771 F.2d 1504, 1514 (D.C.Cir.1985) (holding a mandamus claim moot where requested duty was subsequently performed). With respect to plaintiff Sierra Club, because it has conceded that the NEPDG no longer exists, several of the nondiscretionary duties imposed by FACA, such as opening meetings to the public, and providing notice of meetings in the Federal Register, can no longer be ordered by this Court.

As discussed above with respect to mootness, however, one claim for injunctive relief remains available to Sierra Club: the requirement that records related to the advisory committee's work be made public, 5 U.S.C.App. 2 § 10(b). In other words, the requested relief is not rendered moot by the termination of the advisory committee or the language in the statute "until the advisory committee ceases to exist." That request for relief would only be rendered moot by the disclosure of the documents to plaintiff. *See, e.g., Gray v.*

*Office of Personnel Management,* 771 F.2d 1504, 1514 (D.C.Cir.1985) (holding a mandamus claim moot where requested duty was subsequently performed); *see also Byrd v. EPA,* 174 F.3d 239 (D.C.Cir.1999) (FACA claim moot when government released documents); *Physicians Comm. for Responsible Medicine v. Glickman,* 117 F.Supp.2d 1 (D.D.C.2000) (same).

■ The duty to make documents related to an advisory committee available to the public is non-discretionary. Section 10(b) states:

> Subject to [the FOIA], the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist.

5 U.S.C.App. 2 § 10(b). The language of this section leaves no room for discretion: the records "shall be available for public inspection." *Id.* The Supreme Court has stated that by using "shall" in a civil forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied." *United States v. Monsanto,* 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989); *see also Pierce v. Underwood,* 487 U.S. 552, 569–70, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (Congress' use of "shall" in a housing subsidy statute constitutes "mandatory language"); *Barrentine v. Arkansas–Best Freight Sys. Inc.,* 450 U.S. 728, 739 n. 15, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); Black's Law Dictionary 1233 (5th ed. 1979) ("As used in statutes ... [shall] is generally imperative or mandatory."). The mandamus statute does allow for the

possibility of invoking FOIA exemptions to protect some documents. That exception to the public disclosure rule does not, however, introduce discretion into the statutory mandate. If no FOIA exemption applies to the documents in question, the documents "shall be made available." § 10(b)

With respect to the claims made by Judicial Watch, because Judicial Watch alleges that the NEPDG continues to exist, none of the duties created by FACA are moot. In addition to the duty to make documents publically available, FACA creates several other duties, that by virtue of the use of the word shall, Congress has made nondiscretionary. *See* 5 U.S.C.App. 2 § 10(a)(1) (meetings shall be public); § 10(a)(2) (timely notice shall be published); § 10(a)(3) (interested persons shall be permitted to attend, subject to reasonable rules and regulations); § 10(b) (records shall be made public); § 10(c) (minutes shall be kept and shall contain a record of persons present, complete description of matters discussed and conclusions reached, and the accuracy of such minutes shall be certified by chairman); § 11(a) (transcripts shall be made available at cost).

Defendants' sole argument with respect to whether the duties imposed by FACA are discretionary is that FACA imposes no duty on either the Vice President or the individual members of an advisory committee. Defs.' Mot. of 4/5/2002 at 15 ("neither the Vice President (who is not an 'agency head') nor any individual member of a FACA committee is singled out for specific duties under the statute."). Plaintiffs respond that a statute need not single out the specific official on which it imposes a duty in order for that duty to be nondiscretionary. Defendants cite no cases in support of their argument that the statute must single out the relevant individuals by name or title. This argument ignores the

Supreme Court's guidance in *Marbury v. Madison:* "[i]t is not by the office of the person to whom the writ is directed, but the nature of thing to be done, that the propriety or impropriety of issuing a mandamus is to be determined." 5 U.S. (1 Cranch) at 170. The relevant question is whether, in light of the facts as alleged in the complaints, the duty to make records public or comply with any of the other above-listed duties, could have fallen on any of the defendants. The statute does not specify who shall be responsible for this duty. As discussed above, it is possible that the Vice President had final responsibility for all decisions with respect to the NEPDG, in which case, the duty to allow public access to the records would appear to fall on his shoulders. It is possible that the NEPDG made decisions collectively, in which case the responsibility could fall on the shoulders of all members.

What is clear from the statute is that some government official, whether it is the Vice President or the NEPDG participants or someone else, has a duty pursuant to FACA if the facts as alleged are proven. To whom that non-discretionary duty falls is a question to be explored in discovery. At this stage of the case, however, the Court need only acknowledge that FACA creates non-discretionary duties, and that, according to plaintiffs' allegations, one of the defendants sued here could have violated those duties.

### 3. *Should This Court Exercise Its Mandamus Discretion?*

■■■■ Even where a duty is clear and nondiscretionary, whether or not to issue the writ of mandamus is a determination committed to the discretion of this Court. *Cartier v. Sec. of State,* 506 F.2d 191, 199 (D.C.Cir.1974); *National Treasury Employees Union v. Nixon,* 492 F.2d 587 (D.C.Cir.1974). While mandamus is not

necessarily precluded where the official is the President or Vice President of the United States, separation of powers concerns may impact the exercise of this Court's discretion. *National Treasury Employees Union v. Nixon,* 492 F.2d 587 (D.C.Cir.1974) (declining to issue writ of mandamus despite duty of President to issue pay raise out of respect for separation of powers).

At this stage of the case, it would be premature and inappropriate to determine whether the relief of mandamus will or will not issue. Certainly whether relief is available under the APA will be relevant to whether the mandamus relief requested will be necessary. It is sufficient to determine that plaintiffs have stated a claim for relief under the mandamus statute. Whether or not plaintiffs will prove that claim remains to be seen.

### E. Constitutional Separation of Powers Concerns

■■■■ The constitutional question suggested by this case is whether Congress can pass a law granting the public access to the deliberative process of a formally constituted group of the President's advisors when at least one of those advisors is a private individual without violating Article II. The application of FACA to this group, argue defendants, interferes with the President's constitutionally protected ability to receive confidential advice from his advisors, even when those advisors include private individuals. Resolving that constitutional question, however, is premature at this stage of the proceedings. The government would have this Court answer that question in the negative now and dismiss the case without ever providing any discovery into the nature and number of the meetings at issue, the identities of the participants, the nature of the group's interaction with the President, the role of

the Vice President in the group, the nature of the alleged Sub–Groups' interaction with the NEPDG, or the proximity of the NEPDG and alleged Sub–Groups to the President. The government further argues that it would violate the Constitution for this Court to even inquire into these matters.

The doctrine of constitutional avoidance counsels against answering such an important constitutional question at the motion to dismiss stage. By declining to resolve the constitutional issue at this stage of the case, this Court does not intend to suggest any doubt about the seriousness of the constitutional challenge raised by defendants to the application of FACA and the APA here. Rather, it is out of concern for the seriousness of this issue that this Court has determined that proceeding to discovery is appropriate.

It is a fundamental principle of constitutional interpretation that a court should not pass on any constitutional questions that are not necessary to determine the outcome of the case or controversy before it. *Burton v. United States,* 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case."). The Supreme Court has consistently explained: "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." *Spector Motor Service v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944). Furthermore, it is equally fundamental that a court should not pass on a constitutional question prematurely. "It has long been the Court's 'considered practice not to decide abstract, hypothetical or contingent questions ... or to decide any constitu-

tional question in advance of the necessity for its decision ... or to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied ... or to decide any constitutional question except with reference to the particular facts to which it is to be applied....'" *Clinton v. Jones,* 520 U.S. 681, 690 n. 11, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (*quoting Alabama State Fed'n of Labor v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945)).

Here, the federal defendants ask this Court to resolve a constitutional question prematurely and, in so doing, fashion a constitutional ruling broader than the precise facts underlying this case. Defendants ask this Court to hold unconstitutional the application of FACA to any facts and factual inferences permissible from the face of plaintiffs' complaints. While it may be the case that plaintiffs will be able to prove all the pled facts as true, something defendants seriously contest, it is also likely that discovery will reveal facts that narrow the issues before this Court considerably. The proof of any violation of the statutes at issue here, FACA, the APA, and the federal mandamus statute, is contingent on development of a factual record. It is entirely possible that defendants will prevail on summary judgment on statutory grounds after proving that no private individuals participated as members of the advisory committees at issue, or that plaintiffs have failed to identify final agency action, thus rendering defendants' constitutional concerns inapplicable. Furthermore, development of the factual record will better enable this Court, if ultimately faced with deciding whether it violates separation of powers to apply the APA, FACA, or the federal mandamus statute in this context, with the information necessary to properly apply the constitutional balancing test in the nuanced, fact-intensive fashion required by precedent. *E.g.,*

*Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988); *Nixon v. Administrator of General Servs.,* 433 U.S. 425, 443, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (*Nixon II* ); *Ass'n of Am. Physicians and Surgeons v. Clinton,* 997 F.2d 898 (D.C.Cir.1993).

Defendants' justification for this Court determining the constitutional issue at this stage of the case is two-fold: first, they argue that no factual development is required to determine the constitutional issue, and second, that any factual discovery would raise identical constitutional concerns. Defendants' first argument flies in the face of the precedent that has developed separation of powers doctrine as a fact-intensive, case-by-case analysis of the specific nature of the intrusion into the President's performance of his constitutional duties. *Morrison,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569; *Nixon II,* 433 U.S. at 443, 97 S.Ct. 2777. Defendants' second argument is conclusory in nature, unsupported by precedent, and equally unpersuasive.

### 1. *Constitutional Balancing Test Deserves Further Factual Development.*

Before explaining precisely why further factual development is necessary to effectively resolve the constitutional question here, first the Court must briefly discuss the proper legal standard to apply to separation of powers conflicts. Defendants have repeatedly invoked an incorrect constitutional standard in this case, a standard that would increase Executive power at the expense of the other branches of government. Defendants have made these arguments despite previous concessions of defense counsel that their preferred standard did not reflect the governing law. The government's oscillations before this Court reflect what appears to be a problematic and unprecedented assertion, even in the face of contrary precedent, of Executive power. To borrow the words of the D.C. Circuit in *Nixon v. Sirica,* "[s]upport for this kind of mischief simply cannot be spun from incantation of the doctrine of separation of powers." 487 F.2d 700, 715 (D.C.Cir.1973).

### a. *Constitutional Standard*

The Supreme Court has affirmed time and again the importance of the allocation of governmental power by the United States Constitution into three coordinate branches. *Clinton v. Jones,* 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997); *Morrison,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569; *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *Humphrey's Executor,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). This separation of powers was regarded by the Framers of the Constitution as "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley v. Valeo,* 424 U.S. 1, 122, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *see also Mistretta v. United States,* 488 U.S. 361, 383, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) ("[c]oncern of encroachment or aggrandizement ... has animated our separation of powers jurisprudence."). Thus, the Supreme Court has invalidated actions by one branch of government that impermissibly usurp the power of another co-equal branch. *See, e.g., Plaut v. Spendthrift Farm,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (unconstitutional legislative assumption of judicial power); *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (unconstitutional legislative assumption of executive power); *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (unconstitutional executive assumption of legislative power). Even when a branch of government does

not assume for itself a power allocated to another, "the separation of powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Loving v. United States*, 517 U.S. 748, 757, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996); *Commodity Futures Trading Comm. v. Schor*, 478 U.S. 833, 856–57, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986); *Nixon II*, 433 U.S. at 443, 97 S.Ct. 2777.

If one thing is clear from these separation of powers cases, it is that the lines that divide the powers of the three branches of government are neither absolute nor "neatly drawn." *Clinton v. Jones*, 520 U.S. at 701, 117 S.Ct. 1636. "In designing the structure of our Government and dividing and allocating the sovereign power among three coequal branches, the Framers of the Constitution sought to provide a comprehensive system, but the separate powers were not intended to operate with absolute independence." *United States v. Nixon*, 418 U.S. 683, 707, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (*Nixon I*). Conflicts and overlap are necessary byproducts of the constitutional design of checks and balances among the three branches of government.

The potential application of FACA to the NEPDG may well require this Court to determine the proper boundaries between the respective spheres of the co-equal branches of government. Indeed, the Supreme Court has recognized that applying FACA to meetings among Presidential advisors "present[s] formidable constitutional difficulties." *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 466, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989); *see also Ass'n of Am. Physicians and Surgeons v. Clinton*, 997 F.2d 898 (D.C.Cir.1993)(*AAPS*). To be clear, defendants do not argue that the application of FACA would result in the aggrandizement of the Congressional or judicial role by usurping the powers of the Executive. Rather, the defendants contend that the application of FACA to the NEPDG encroaches on the sphere of the Executive by infringing the President's right to receive the confidential advice necessary to discharge his unique duties. In such a case, the proper test for determining whether Article II of the Constitution has been violated was first articulated by the Supreme Court in *Nixon II*:

> In determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. [citing *Nixon I*]. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.

433 U.S. at 443, 97 S.Ct. 2777; *see also Morrison*, 487 U.S. at 695, 108 S.Ct. 2597 (1988); *AAPS*, 997 F.2d at 910. Thus, this Court would first examine whether FACA, as applied to the facts of this case, prevents the Executive Branch from accomplishing any constitutionally assigned functions. *Morrison*, 487 U.S. at 696, 108 S.Ct. 2597 (holding that the act creating the independent counsel's office did not infringe on the President's ability to "perform his constitutionally assigned duties"); *see also Clinton v. Jones*, 520 U.S. at 705–06, 117 S.Ct. 1636 (holding that civil lawsuit against sitting President did not constitute an impermissible intrusion by judiciary into ability of President to fulfill duties). If that question is answered affirmatively, this Court would then address whether that infringement is justified by the purposes of the congressional action. *Nixon II*, 433 U.S. at 443, 97 S.Ct. 2777; *AAPS*, 997 F.2d at 910.

The inconsistency in defendants' position with respect to the proper test to be applied to determine the constitutionality of an interference with Executive authority is troubling. The development of the government's constitutional arguments in this case is worth recounting. In the initial motion to dismiss the original Judicial Watch complaint, the government urged this Court to adopt a constitutional standard that has never gained the endorsement of a majority of the Supreme Court, and has recently been expressly rejected by the D.C. Circuit. Defendant argued that "[t]he Supreme Court has made clear that where, as here, the power the President is exercising is a power granted explicitly to him by the Constitution, Congress cannot interfere with that power and any statute that purports to do so is unconstitutional." Defs.' Mot. of 10/17/02 at 14. Relying on the concurrence in *Public Citizen* rather than the majority in *Nixon II*, 433 U.S. at 443, 97 S.Ct. 2777, or *Morrison*, 487 U.S. at 696, 108 S.Ct. 2597, the government argued that where "a power has been committed to a particular Branch of Government in the text of the Constitution, the balance has already been struck by the Constitution itself." *Public Citizen*, 491 U.S. at 486, 109 S.Ct. 2558.

While conceding that the *Nixon/Morrison* balancing test applies, *See* Tr. 2/12/2002 at 33:17 – 34:1; 35:8 – 35:23; 36:15 – 38:7; 38:20 – 39:1; 39:9 – 40:16, the government urges this court nonetheless to apply the bright-line rule embraced by the *Public Citizen* concurrence. The gov-

ernment argued in its motions to dismiss that

> [w]hile the Court has, in other circumstances, considered the degree of intrusion into the Executive's constitutionally protected interest in light of the Congress' interest in adopting the particular legislation at issue in determining whether that legislation is valid, see *Morrison*, 487 U.S. at 695, 108 S.Ct. 2597, that approach is unnecessary where, as here, the legislation impedes the President's ability to carry out his *express* constitutional authority. *Public Citizen*, 491 U.S. at 484–86, 109 S.Ct. 2558 (Kennedy, J., concurring).

Defs.' Mot. of 3/8/02 at 24 (emphasis in original). Defendants have cited *no authority* other than the *Public Citizen* concurrence that explicitly holds that any infringement of a textually-authorized constitutional duty is a *per se* violation of separation of powers, nor could they.[11]

The Executive Branch has long argued for a more formalistic understanding of the separation of powers doctrine than the Supreme Court and other courts have been willing to accept. *See Nixon I*, 418 U.S. at 706–707, 94 S.Ct. 3090; *Nixon II*, 433 U.S. at 441–44, 97 S.Ct. 2777; *AAPS*, 997 F.2d at 906 ("According to the government, [the Recommendation Clause] gives the President the sole discretion to decide what measures to propose to Congress, and it leaves no room for congressional interference."). In *Nixon II*, the Court rejected the government's argument for "three air-

**11.** To be fair, with respect to the constitutional standard, the government did brief both its preferred bright-line rule derived from the *Public Citizen* concurrence, and the application of the *Nixon/Morrison* balancing test. However, the government's brief says nothing about the fact that government's counsel conceded at oral argument to this Court that the *Public Citizen* concurrence standard is not the controlling law. Furthermore, while the gov-

ernment's briefs argue these two standards in the alternative, they say nothing about which alternative this Court *should* apply. If anything, the government's briefs imply that this Court should apply the *Public Citizen* test. *See* Defs.' Reply of 4/26/02 at 15 ("even assuming that *AAPS* mandates the balancing approach rather than the *Public Citizen* standard (a point Plaintiffs assert and Defendants contest) . . .").

tight departments" of government as "archaic." 433 U.S. at 441–44, 97 S.Ct. 2777. The Court has instead consistently embraced the view articulated by Justice Jackson in *Youngstown Sheet & Tube Co. v. Sawyer:*

> While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.

343 U.S. at 635, 72 S.Ct. 863 (Jackson, J., concurring). In *Mistretta v. United States,* the Court explained, "The Constitution imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence the absence of which 'would preclude the establishment of a Nation capable of governing itself effectively.'" 488 U.S. 361, 381, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). Indeed, separation of powers principles do not mean that the branches of government "ought to have no partial agency in, or no control over the acts of each other." James Madison, The Federalist No. 47.

With this conception of the separation of powers doctrine in mind, the Supreme Court has never agreed with the position taken by the government here, that any infringement on any enumerated power in Article II is necessarily a *per se* violation of the Constitution. In *Morrison,* Justice

Scalia's argument that the "executive power" described in Article II of the Constitution "does not mean *some of* the executive power, but *all of* the executive power" gained the support of no other Justice. 487 U.S. at 711, 108 S.Ct. 2597 (Scalia, J., dissenting). In his lone dissent, Justice Scalia argued for a "clear constitutional prescription that the executive power belongs to the President" and against the majority's "balancing test." *Id.* The majority of the Court opted to apply a balancing test to determine whether Congress had "impermissibly" intruded on the executive power. *Id.* at 696, 108 S.Ct. 2597. In *Public Citizen,* three other Justices argued for a bright-line rule similar to that advocated by Justice Scalia in *Morrison. Public Citizen,* 491 U.S. at 484–86, 109 S.Ct. 2558 (Kennedy, J., concurring).[12] Once again, that view did not persuade a majority of the Justices, who invoked the doctrine of constitutional avoidance to interpret FACA so as to avoid a constitutional challenge. *Id.* at 466, 109 S.Ct. 2558. Furthermore, in *AAPS,* the D.C. Circuit conducted a lengthy discussion of the flaws in the government's bright-line rule argument, offered by the government in that case as well.[13] 997 F.2d at 906–11.

The implications of the bright-line rule advocated by the government are stunning. Even if this Court were to consider the question of what separation of powers standard to apply without the benefit of

---

**12.** Justice Scalia recused from the *Public Citizen* case.

**13.** While the D.C. Circuit's discussion of the constitutional issue raised by the application of FACA to the Health Care Task Force was arguably dicta because the Court ultimately declined to decide the constitutional issue, the Court explained that it was necessary to determine the strength of the constitutional argument raised by the government prior to applying the doctrine of constitutional avoidance. 997 F.2d at 906 ("It is, of course,

necessary before considering the maxim of statutory construction to determine whether the government's constitutional argument in this case is a powerful one. In other words, are we truly faced, as the Court thought it was in Public Citizen, with a grave question of constitutional law?"). The Court rejected the government's constitutional standard but noted that the constitutional *concerns raised* were serious. This Court agrees with and follows the reasoning of that court, *Nixon II* and *Morrison.*

precedent, it would reach the conclusion that the government's position is untenable. Any action by Congress or the Judiciary that intrudes on the president's ability to recommend legislation to Congress or get advice from Cabinet members *in any way* would necessarily violate the Constitution. The Freedom of Information Act and other open government laws would therefore constitute an unconstitutional interference with Executive authority. Any action by a court or Congress that infringes on any other Article II power of the President, for example, the President's role as Commander in Chief of the armed forces and the national security concerns that derive from that role, would violate the Constitution. Any congressional or judicial ruling that infringes on the President's role in foreign affairs, would violate the Constitution. Clearly, this is not the law. Such a ruling would eviscerate the understanding of checks and balances between the three branches of government on which our constitutional order depends.

Finally, this is not the first case before this Judge in which the government has advocated the theory of separation of powers rejected here.[14] While the government, like any other party, is free to argue for an extension of the law, it should be forthcoming when calling for such an extension. The fact that the government may want to advocate a new theory of Executive authority and the separation of powers is its prerogative. It cannot, however, cloak what is tantamount to an ag-

grandizement of Executive power with the legitimacy of precedent where none exists.

b. *Application of Constitutional Standard Requires Further Facts*

Thus, it is clear that once the question of whether applying FACA to the NEPDG violates Article II is properly before this Court, the constitutional inquiry will require balancing the following two considerations: first, this Court must inquire into whether the law's requirements would infringe the President's ability to perform constitutional functions, and second, the Court must determine whether that impairment is outweighed by any constitutionally authorized Congressional purposes. *Nixon II*, 433 U.S. at 443, 97 S.Ct. 2777; *Morrison*, 487 U.S. at 696, 108 S.Ct. 2597. It is critical to the application of this test that the Court determine the precise nature of the intrusion into Executive authority. The greater the intrusion into the Executive sphere, the greater the interest necessary to justify the intrusion.

The constitutional authority at stake here is the President's ability to receive advice that has been generated in confidence. While no clause of Article II expressly grants the President the power to acquire information or receive advice in confidence, the necessity of receiving confidential advice appears to flow from Article II. Several clauses of Article II reflect an understanding that the President will have access to information and the power to acquire it,[15] and the Supreme Court has

**14.** In this case, and in at least one other before this Court, *Stillman v. Doe*, Civ. Action No. 01–1342(EGS) (D.D.C.), the government has proceeded by mischaracterizing the existing standard and invoking the concurring opinion of three Justices of the Supreme Court in *Public Citizen* as controlling authority. The fact that the government has stubbornly refused to acknowledge the existing controlling law in at least two cases, does not

strike this Court as a coincidence. One or two isolated mis-citations or misleading interpretations of precedent are forgivable mistakes of busy counsel, but a consistent pattern of misconstruing precedent presents a much more serious concern.

**15.** For example, Article II, Section 2, grants the President the power to "require the Opinion in writing, of the principal Officer in each

repeatedly recognized that the importance to the Presidency of receiving candid, honest, and when necessary, unpopular, advice from "high Government officials and those who advise and assist them in the performance of their manifold duties" is paramount. *Nixon I*, 418 U.S. at 705, 94 S.Ct. 3090. Indeed, the words of the *Nixon I* Court bear repeating:

[T]he importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process.

*Id.* That Court went on to explain:

The expectation of a President to the confidentiality of his conversations and correspondence, like the claim of confidentiality of judicial deliberations, for example, has all the values to which we accord deference for the privacy of all citizens, and added to those values, is the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking. A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately.

*Id.* at 708, 94 S.Ct. 3090; *see also In re Sealed Case*, 121 F.3d 729, 736–40

(D.C.Cir.1997) (discussing the history of the protection of executive communications and the executive privilege doctrine). As the D.C. Circuit explained in *AAPS*, "The Framers thus understood that secrecy was related to the executive's ability to decide and to act quickly—a quality lacking in the government established by the Articles of Confederation. If a President cannot deliberate in confidence, it is hard to imagine how he can decide and act quickly." 997 F.2d at 909.

Thus, although there is no specific privilege for protecting the confidentiality of Presidential communications or deliberations in the text of the Constitution, "[c]ertain powers and privileges flow from the nature of the enumerated powers; the protection of the confidentiality of Presidential communications has similar constitutional underpinnings." *Id.* (*citing McCulloch v. Maryland*, 4 Wheat. 316, 4 L.Ed. 579 (1819)). Equally clear, however, is that the need to maintain the confidentiality of the President's communications and deliberations is not unqualified. "The President's need for complete candor and objectivity from advisors calls for great deference from the courts. However, when the privilege depends solely on the broad, undifferentiated claim of public interest in the confidentiality of such conversations, a confrontation with other values occurs." *Nixon I*, 418 U.S. at 706, 94 S.Ct. 3090.

The question raised by the application of FACA to the NEPDG and the alleged

---

of the executive Departments, upon any subject relating to the Duties of their respective Offices." In addition, the State of the Union clause, requiring the President "from time to time give to the Congress Information of the State of the Union" presupposes superior or at least different access to information than the legislative branch. Art. II, Sec. 3. The Recommendations Clause, invoked by the government in this case, which empowers the President to "recommend to [Congress] such

Measures as he shall judge necessary and expedient," similarly presupposes the ability to collect information and advice necessary to make such recommendations. Art. II, sec. 2. And as the Constitution did not presume the President to operate in a vacuum, the other powers listed in Article II, generally presuppose the President's ability to receive advice in order to exercise those powers in an informed manner.

Sub–Groups is not whether the President's constitutionally protected ability to receive advice in confidence is undermined, but whether his advisors' ability to deliberate in confidence is constitutionally protected, and how far down the line that protection extends. *Cf. In re Sealed Case*, 121 F.3d at 746 ("Does [executive] privilege only extend to direct communications with the President, or does it extend further to include communications that involve his chief advisers? And if the privilege does extend past the President, how far down into his circle of advisers does it extend?"). It is unclear from the facts pled in plaintiffs' complaints whether they allege that any of the deliberations involved communications with the President himself. Indeed, the only advice alleged to have directly been given to the President by the NEPDG, the final energy policy report, is a public document. *See* www.whitehouse.gov/energy/ National–Energy–Policy. pdf.

While the Supreme Court has not reached the issue, the D.C. Circuit has held that the constitutional protection for executive communications extends beyond those communications that occur directly with the President. *See In re Sealed Case*, 121 F.3d 729 (D.C.Cir.1997). The D.C. Circuit's warning about extending that constitutional protection too far applies here as well:

> Extending presidential privilege to the communications of presidential advisers not directly involving the President inevitably creates the risk that a broad array of materials in many areas of the executive branch will become "sequester[ed]" from public view. *Wolfe*, 815 F.2d at 1533. President Nixon's attempt to invoke presidential privilege to prevent release of evidence indicating that high level executive officers engaged in illegal acts is perhaps the starkest example of potential for abuse of the privilege. And

openness in government has always been thought crucial to ensuring that the people remain in control of their government ... The very reason that presidential communications deserve special protection, namely the President's unique powers and profound responsibilities, is simultaneously the very reason why securing as much public knowledge of presidential actions as is consistent with the needs of governing is of paramount importance.

*Id.* at 749. Indeed, according to James Madison,

> [a] popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives.

Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* 9 WRITINGS OF JAMES MADISON 103 (Gaillard Hunt, ed.1910). The D.C. Circuit in *In re Sealed Case* did specifically limit its analysis to the context before it:

> Our determination of how far down into the executive branch the presidential communications privilege goes is limited to the context before us, namely where information generated by close presidential adviser is sought for use in a judicial proceeding, and we take no position on how the institutional needs of Congress and the President should be balanced.

121 F.3d at 753 (D.C.Cir.1997). However, despite the limitation on its holding, *In re Sealed Case* makes clear that determining how far down the line of advisors constitutional protection should extend in the context of balancing the needs of the Executive and Congress will be a fact-intensive inquiry.

Determining who participated in the deliberations of the NEPDG and the alleged Sub–Groups, whether in fact those Sub–Groups existed, and who interacted with the private individuals involved, the role played by private individuals, and the number of meetings and interactions will affect this Court's determination of the impact that revealing such activities to the public would have on the President's ability to perform his Executive functions. Furthermore, the role of the Vice President in the NEPDG is to be determined. The fact that the Vice President was tasked with leading the NEPDG does not mean that in fact he participated in all aspect of the NEPDG or the meetings of the alleged Task Force Sub–Groups. These Sub–Groups could have been much less operationally proximate to the President, and revealing their activities would arguably infringe the President's Executive authority to a much lesser degree.

Furthermore, no case has directly decided whether revealing the identity or nature of advice given by private individuals to the President or the President's advisors would "impede the President's ability to perform his constitutional duty." *Morrison*, 487 U.S. at 691, 108 S.Ct. 2597. However, two cases have looked at the role of private individuals in advising the President and have suggested that constitutional protection would extend to such advice. *See Public Citizen*, 491 U.S. at 466, 109 S.Ct. 2558; *AAPS*, 997 F.2d at 910. In *Public Citizen* the Supreme Court recognized the "formidable constitutional difficulties" that would be raised by applying FACA to the Justice Department's consultations with the committee of the American Bar Association that evaluates the qualifications of federal judicial nominees. 491 U.S. at 466, 109 S.Ct. 2558. In discussing the constitutional issue raised by the application of FACA to President Clinton's Heath Care Task Force, the D.C.

Circuit stated: "A statute interfering with a President's ability to seek advice directly from private citizens as a group, intermixed, or not, with government officials, therefore raises Article II concerns." *AAPS*, 997 F.2d at 910. After noting the constitutional concern, both courts declined to resolve the question of whether applying FACA to a group that includes governmental and private advisors prevents the President from accomplishing his constitutionally assigned functions. Thus, the question of whether granting public access to the deliberations of high level officials of government, presidential advisors, and private individuals intrudes upon the ability of the President to conduct his official duties is unresolved. The extent of the constitutional protection for those deliberations will turn in large part on the proximity of those advisors to the President. The fact that the group was established to deliver a final report to the President is not determinative.

Additionally, this Court would be careful when applying the *Morrison* balancing test to look at those specific requirements of FACA that would have applied to the NEPDG and its alleged Sub–Groups, and determine whether applying those requirements would have infringed on the President's ability to do his job. The question here is not only whether releasing the names of the participants, or the documents generated by the group would so infringe, but rather would applying all of the FACA requirements to the NEPDG run afoul of the separation of powers. Amicus correctly points out that the imposition of the FACA requirements is less onerous than portrayed by the government. FACA has two very important exceptions to the requirement that the public have access to meetings and documents. Pursuant to various FOIA exemptions, which include deliberative process and na-

tional security concerns, documents may be withheld from the public. 5 U.S.C.App. 2 § 10(b). Furthermore, pursuant to the exceptions listed in 5 U.S.C. § 552b, the President or an agency head can close advisory committee meetings to the public. These exceptions should be considered when determining the actual impact that FACA would have on the confidentiality of advice to the President.

All of these questions are better addressed only after discovery into the activities and composition of the NEPDG and the alleged Sub–Groups. Contrary to defendants' argument, it would be inappropriate for this Court to conduct the fact-intensive inquiry demanded by separation of powers precedent by considering only the Presidential Memorandum that established the NEPDG.

### 2. *Discovery in this Case Will Raise Fewer and Different Constitutional Concerns*

Defendants' second argument against proceeding to discovery, that discovery raises identical constitutional issues as does this motion to dismiss, is both conclusory and belied by precedent. Defendants, in a footnote, state in a conclusory manner "that these constitutional arguments apply to prevent discovery in this case." Defs.' Mot. of 4/5/02 at 19 n. 17. Further, in response to an Order from this Court requiring defendants to identify with precision the constitutional concerns raised by discovery into particular factual issues, *see* Order of 1/31/02, defendants simply reasserted the troubling statutory and constitutional arguments that had prompted this Court's Order in the first place. Defs.' Mem. of 2/5/2002 at 1 ("it is unnecessary for the Court to address the constitutional issues [raised by discovery] for five compelling reasons"). Thus, while defendants have consistently asserted that

discovery would implicate constitutional concerns, they have also consistently failed to explain or provide legal support for those conclusions.

Contrary to defendants' arguments, discovery in this case will potentially raise related, but different, constitutional questions than does the application of FACA to the NEPDG. In particular, the constitutional question raised by the application of a statute to Executive action, reflects a conflict between the Executive and Congressional branches of government, and must be balanced as such. Any potential intrusion into the President's constitutional authority that occurs because of specific requests for documents or information during the course of discovery must be analyzed as a conflict between the needs of the Executive and Judicial branches, and will involve the application of different precedent. *See, e.g., In re Sealed Case,* 121 F.3d at 753. Furthermore, the breadth and scope of the constitutional issue raised by applying the requirements of FACA to advisory committees established by the President dwarfs the particular, specific questions that will be raised by a very tightly-reigned discovery process. Whether revealing a particular document or piece of information will impermissibly interfere with the President's constitutional authority is a much more narrow inquiry than whether the application of all the FACA procedural requirements to the deliberative process of Presidential advisors will violate the Constitution. Rather than address this broad constitutional question in a factual vacuum, this Court will address the particular questions generated by discovery requests.

In conclusion, there are three primary reasons why postponing consideration of defendants' constitutional challenge is warranted here. First, after discovery, the government may prevail on summary

judgment on statutory grounds without the need for this Court to address the constitutionality of applying FACA. Second, even if this Court were to attempt to apply the *Nixon/Morrison* balancing test, further factual development is necessary to clearly determine the extent to which applying FACA to the NEPDG and its alleged Sub–Groups will intrude on the President's constitutional authority. Third, while discovery in this case may raise some constitutional issues, those issues of executive privilege will be much more limited in scope than the broad constitutional challenge raised by the government here. All of these reasons weigh heavily in favor of considering any applicable constitutional questions after a factual record has been more fully developed, and requiring the government to raise specific constitutional objections to the discovery process as it proceeds.

### F. Judicial Watch's FOIA Claim

Judicial Watch has also sued the Vice President pursuant to FOIA. On June 25, 2001, Judicial Watch wrote to the Vice President and requested certain records related to the NEPDG pursuant to FOIA. *See* Jud.Watch Sec.Amend.Compl., Ex. 8. On July 5, 2001, the Counsel to the Vice President responded on behalf of the Vice President, declining the request on the grounds that FOIA does not provide for disclosure of the requested material. *See* Jud.Watch Sec.Amend.Compl., Ex. 9.

 FOIA is only applicable to "agencies" and "agency records." *See generally* 5 U.S.C. § 552. Entities within the Executive Office of the President whose "sole function is to advise and assist the President" are not agencies for purposes of FOIA. *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 155–56, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980); *Meyer v. Bush*, 981 F.2d 1288, 1294 (D.C.Cir.1993). Defendants persuasively argue that the Vice President and his staff are not "agencies" for purposes of FOIA. *See Meyer v. Bush*, 981 F.2d at 1294 (expressing doubt as to whether FOIA applies to Vice President); *cf. Armstrong v. Bush*, 924 F.2d 282, 286 n. 2 (D.C.Cir.1991) (President and Vice President subject only to Presidential Records Act, not Federal Records Act).[16] The FOIA claim against the Vice President is therefore dismissed.

Both Judicial Watch and the federal defendants assume that Judicial Watch's Second Amended Complaint also states a FOIA claim against the NEPDG. *See* Defs.' Mot. to Dismiss of 3/8/02 at 15; Jud.Watch Opp'n of 3/21/02 at 14–15 (arguing that further discovery is necessary before determining whether the NEPDG is an "agency" for FOIA purposes). However, Count II of the Complaint does not state that plaintiff filed a FOIA request to the NEPDG, but rather that plaintiff sent a request letter to Vice President Cheney and that counsel on behalf of Vice President Cheney responded. The request letter in question, attached as Exhibit 8 to Judicial Watch's Second Amended Complaint, confirms that the request for records was indeed made only to the Vice President. For this reason, there is no need for this Court to address whether the NEPDG is an "agency" for purposes of FOIA. Judicial Watch has stated a FOIA claim only against the Vice President, and that claim is dismissed.

### III. Private Defendants' Motions to Dismiss

In addition to suing the Vice President, the NEPDG, and other federal officials,

---

**16.** Like the D.C. Circuit in *Meyer,* 981 F.2d at 1294 n. 7, this Court does not decide whether the Vice President could ever act as the head of a agency subject to FOIA.

Judicial Watch has sued several private individuals, including Mark Racicot, Haley Barbour, Kenneth Lay, Thomas Kuhn, and John and Jane Does 1–99. These individuals are named as defendants only with respect to Count I of Judicial Watch's Second Amended Complaint, which alleges violations of FACA.[17] For the reasons discussed above, FACA provides no private cause of action and therefore these claims are dismissed.

## CONCLUSION

For the foregoing reasons, the federal defendants' motions to dismiss are granted in part and denied in part and the private defendants' motions to dismiss are granted. An appropriate Order accompanies this Memorandum Opinion.

**IT IS SO ORDERED.**

## ORDER

For the reasons stated in the accompanying Memorandum Opinion issued this same day, it is hereby

**ORDERED** that this Order shall supercede the Order issued by this Court on May 23, 2002; it is

**FURTHER ORDERED** that the federal defendants' motions to dismiss plaintiff Judicial Watch's Second Amended Complaint and plaintiff the Sierra Club's Complaint are **GRANTED IN PART AND DENIED IN PART**; it is

**FURTHER ORDERED** that the motions to dismiss filed by Mark Racicot, Haley Barbour, and Thomas Kuhn are **GRANTED**; it is

**FURTHER ORDERED** that Count I of Judicial Watch's Second Amended Complaint is **DISMISSED** with respect to all defendants; it is

**FURTHER ORDERED** that Count II of Judicial Watch's Second Amended Complaint is **DISMISSED** with respect to all defendants; it is

**FURTHER ORDERED** that plaintiffs' APA claims with respect to Vice President Richard Cheney and the National Energy Policy Development Group (NEPDG) are **DISMISSED**; it is

**FURTHER ORDERED** that the federal defendants' motion to dismiss Counts III and IV of Judicial Watch's Second Amended Complaint is **DENIED** with respect to the remaining defendants; it is

**FURTHER ORDERED** that the federal defendants' motion to dismiss the Sierra Club's First and Second Claims for Relief is **DENIED** with respect to the remaining defendants; it is

**FURTHER ORDERED** that plaintiffs shall jointly submit a proposed discovery plan by no later than **5 p.m.** on **Friday, July 19, 2002**; it is

**FURTHER ORDERED** that defendants shall file any objections to the proposed discovery plan by no later than **5 p.m.** on **Friday, July 26, 2002**; it is

**FURTHER ORDERED** that plaintiffs shall file a joint reply by no later than **5 p.m.** on **Tuesday, July 30, 2002**; it is

**FURTHER ORDERED** that a status hearing shall be held on **Friday, August 2, 2002** at **9 a.m.** in **Courtroom One** to discuss the proposed discovery plan and any objections thereto and to determine whether further briefing is necessary with re-

---

**17.** The private individuals were initially named as defendants in Count III as well, but that claim against these defendants was dismissed on May 31, 2002. *See* Order of 5/31/02. Only federal defendants are named in Counts II and IV.

spect to any claims of privilege asserted by the government.

**IT IS SO ORDERED.**